Judge Ewing

delivered the Opinion of the Court.
Heddleson, as the administrator of Paul Durrett, deceased, on the 1st day of March, 1836, sold to Adam Rist, the stock in a tanyard of the decedent, at the price of $1831 94, and took his note for the amount, payable twelve months after date, with Reck and eleven others as his sureties.
On the 12th day of December, 1837, four of the sureties addressed to Heddleson the following note:
Mr. Heddleson:
Dear Sir — We, the securities of Mr. Rist, wish to. see a copy of the article we signed, as we have entirely forgotten the amount, and the different payments.— Please to enclose a copy with the names by mail; though not that we have any doubts that Mr. Rist will not make the payments as they become due. Signed by Peck and three others of the sureties.
The bill.

Answer.

In answer to this note, Heddleson responds as follows:
Mr. Peck:
Dear Sir — I received yours, requesting, with Messrs. Kirk, Goggin and Musick, a copy of the article you have signed as the securities of A Rist. It is a plain note for $1831 94, executed on the 1st day of March, 1836, due in one year from the date; but I consented to wait with Mr. Rist until March, 1838 and 9,to give him time to finish and dispose of the stock in the tanyard before payment. It is signed by Adam Rist, William Duff, Austin S. Risers William H. Peck, Harvey G. Musick, William Bickley, J. B. Goggin, Nicholas Curtis, Benedict Kirk, John Orange, James Best and Alexander Hunter.
Respectfully your Ob’t

J. Heddleson.

Suit was brought on the note in April, 1838, against Rist and his sureties, and judgment recovered, and a Small part of the debt made out of Rist.
The sureties filed their bill of injunction, restraining the collection of the judgment from them; in which they Charge Heddleson with having made á secret agreement with Rist, without their privity or consent, by which he was bound to give time for the payment of the debt,beyond that stipulated in the note signed by them; whereby their risk had been increased; and relying upon the letter of Heddleson, as evidence thereof, they prayed that they might be released from the judgment.
Heddleson answered, denying in unequivocal terms', that he had ever made such agreement with Rist, or seen him since the execution of the. note, That he made' the Sale upon the faith, credit add responsibility of the sureties in said note mainly, who were Rist’s neighbors, living around him, in Mason County, the respondent living in Fleming, and Rist was worth but little besides the stock sold him. That they were some time negotiating the sale, Rist desiring a longer credit to enable him to work Out and make sale.of the stock of leather, to pay the debt, and the respondent requiring that the note should be given upon the same terms of credit allowed to other purchasers of property of the estate, and no other. That, in conversing about the matter, he told Rist that it might *488 be, that he would not require the money at the time the note fell due. But that he imposed no obligation upon himself to wait, or postpone the collection of the debt, a moment after it became due. That he was at ail times at liberty and willing to sue upon the slightest request of any of the sureties, and only delayed suing because the estate did not need the money, and he was disposed, for the mutual benefit of principal and sureties, to indulge, so as to enable Rist to work out the stock, and pay the debt, and was encouraged by the exhibited letter of the four sureties to believe that Rist would, pay. That the “consent” to wait until March, 1838 and 9, expressed in his letter of reply, was a resolution of his own mind only, based upon all the circumstances, and not in pursuance of any promise, contract or agreement whatever, with Rist.
Bill dismissed & appeal.
A party who, in making a contract, gives credit and obtains security, is bound to communicate the terms of the contract fully, to the sureties: if any stipulation by which their risk may be increased, is concealed from them they will not be bound. And—
Where there is a sale on credit, the purchaser giving security, any binding agreement between the seller and purchaser, by which the latter is to have a longer time to pay in, than is expressed in the contract signed by the sureties — if concealed from them will exonerate them. But the secret agreement to have that effect, must be such as the debtor has a right in good conscience encouragement to enforce. Mere encouragement held out to the dector, inducing him to hope for; or expect, indulgence will not exonorate the sureties. So-
*488 The cause being heard upon the bill, answer and two letters exhibited, the injunction Was dissolved, and bill dismissed; and the case has been brought to this Court for revision.
If any agreement was made between Heddleson and Rist, to give a longer time than was stipulated in the note, it was made at or before the execution of the note.
It is well Settled that the concealment from the sureties, of any of the terms of the principal contract, which iricreases the hazard of their undertaking, will entitle them to be discharged from their obligation. The creditor is bound to deal fairly with them; to let them fully into the nature and extent of their responsibility, and to make no secret bargain with the principal, by which the risk to them may be increased.
In the case of Pedcock vs Bishop, 1 Law Library, 87, “the defendant had guarantied the plaintiffs, to the amount of £200, for pig iron to be supplied to Thomas Tickell. Tickell owed one of the plaintiffs an old debt, and agreed to pay ten shillings per ton more than the market price, in liquidation of it. This agreement was concealed from the defendant, the surety; and therefore, he was held not liable.” Abbott, C. J. among other things, said., “the effect of this agreement was to enable the vendor to appropriate to the payment of the old debt, part of those funds which the defendant might reasonably *489 suppose would go towards the payment of those goods for which he became guarantee, and consequently his risk became increased.”
Where in answer to a letter which some of the sureties wrote to a creditor, stating that they had forgotten the amount of the debt, and the different payments &c. and asking for a copy of ‘the article’ — he replied, it -was a plain note, for so much, dated March 1, 1836, due in one year, hut that he had ‘consented to wait till March, 1838 and 9; and, in answer to their bill, charging a concealment, or novation, by which they were entitled to be discharged — denied that he had made any agreement whatever with the principal debtor, .or had ever relinquished, or postponed, His right to exact payment, or sue, and alleging that he merely told the debtor ho might not want the money &c. and that the consent referred, to in his letter, was merely a resolution of his own mind, not founded on any contract or agreement made with the debtor: held that the sureties were not exonerated.
So, upon the like principle, if a secret bargain be made between the creditor and principal; baked upon the consideration of the sale; or upon any other valuable consideration, whereby a longer time is to be given than that stipulated in the contract seen and signed by the sureties, we cannot doubt, that such an agreement, concealed from the sureties, would entitle them to be released from their obligation. Their risk may be increased by the extended time agreed on; and had they known it; they might have refused to become bound as sureties. They may well say non hœc in fadera veni. But the secret contract, to entitle the sureties to be discharged, must be a binding contract, and clearly made out in proof, or at least So far binding as to entitle the principal, in good conscience, to require its enforcement. The mere declaration of the creditor, that he may not need the money, or may not exact prompt payment, or may wait longer, or may, if he deems it prudent, wait till certain means of the principal may be realized, or such like declarations made, or inducements held out, reserving to himself the right to exact payment, or riot exact it, to sue, or not to sue, on or at any time after the day the contract signed by the sureties falls due, will not release the sureties.
By such declarations or inducements, or even conditional consent, to wait, reserving the right to exercise his own discretion on the subject, would not restrict hint from demanding payment, or prosecuting suit at any time when required by the sureties.
The letter of Heddleson, in this case, does not necessarily imply or prove that he made a bargain with thte principal to wait until March, 1838 and 9. He consent: *490 ed to wait, but was that consent one of the terms of the. sale agreed on between him and the principal, unconditionally, as a stipulation of the contract between them and by which the amount due upon the note was in, fact payable in 1838 and 9, and could not, by the terms of the contract, be exacted in good conscience sooner.
The terms of the letter (supra) indicate strongly, that it any agreement for an extension of time was granted to the principal, the sureties were apprised of it before they became bound; and if So, it would not entitle them to be discharged.
We think such an interpretation goes beyond its import, and cannot necessarily be implied from its terms. He may have consented to wait if he chose, and as a matter within his own discretion, and with a reservation of all the rights due to himself, or to the sureties, expressed in the face, of the note. Or the consent may have been a volition o'f his own mind, regarding the condition of the. estate of his intestate, and with a view to the benefit of principal and sureties. Against the positive denial of his answer, that any bargain was made, and in the albsence. of all proof to the contrary, other than the loose, note written by him, we cannot come to the conclusion that such a bargain was made as entitles the. sureties to. be released. And especially as the sureties, have failed to procure the evidence of their principal, to Whom, if any such bargain was made, it was known, and who was. competent to prove it.
Besides: there is strong ground to believe, that the hope, or expectation of indulgence, oh the, part of Rist, or, the understanding that he would be, indulged, or required to pay by instalments only, to enable him. to work out the stock in the tanyard, had been communicated by him to the. sureties,, his neighbors, as an inducement to their becoming bound with him, whether such bargain was in fact made or not,
That this was the fact, and that it, was so deeply impressed upon the minds of the four who wrote, as to leave the impression, that it was a part of their written contract, is clearly inferable from the letter-which they wrote, to Heddleson. They say, “they have entirely forgotten, the amount and different payments, and further express; the opinion that they do not. dount that Rist will make the payments as they become due." The tenor of the letter indicates a distinct impression-upon their minds, that the debt was to be paid by, instalments, From whence *491 did they derive this impression, except from their friend gild neighbor, the principal. And when did they receive it? Most likely, before they became bound, and by which they were induced to become bound, under the expectation that Rist would be able to meet the instalments. If they were apprised of the time given, they cannot complain, though a bargain was made to that effect, and 'those four, most unquestionably, upon this ground, could not be released. And the strong probability is, that the same communication was made to them all. And the fact that it was so made may be the reason for not examining Rist.
Upon the whole, we are satisfied that the complainants are not entitled to the relief which they seek. The decree of the Circuit Court is, therefore, affirmed with costs, and damages upon the damages below.